**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON**

| | | |
|---|---|---|
| JUSTIN FURMAGE, | ) | CASE NO. 1:24-cv-02117-JJH |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| WARDEN HAROLD MAY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

## I.      Introduction

On November 29, 2024, Petitioner Justin Furmage ("Furmage") filed a petition for writ

of habeas corpus under 28 U.S.C. § 2254. (ECF Doc. 1). On January 24, 2025, the matter was

assigned to me under Local Rule 72.2. for issuance of a report and recommended decision. (Non-

document entry of Jan. 24, 2025).

Earlier, I denied without prejudice Furmage's Motion to Expand the Record (ECF Doc.

12), determining that the Respondent had provided the state court record (ECF Doc. 8 and

attachments) in compliance with my Initial Order and the Rules Governing Section 2254 Cases

(ECF Doc. 13). I also granted in part Furmage's Second Motion for Extension (ECF Doc. 14),

permitting him until December 19, 2025 to file his Traverse (ECF Doc. 15). On December 4,

2025, Furmage moved for leave to amend his petition (ECF Doc. 16), and moved for preliminary

injunction regarding his prison library and legal mail access (ECF Doc. 17). Respondent opposed

1

both motions (ECF Docs. 18, 19). On January 2, 2026, I permitted Furmage leave to amend his petition to the extent that he wished to modify his first ground as raising a sufficiency of the evidence claim, but denying leave to amend the petition in its entirety, and denying his motion for extension to file his Traverse, with instruction that he could submit a motion for untimely filing and attach his Traverse for the Court's consideration. (ECF Doc. 20). Furmage again requested extension, which I again denied. (ECF Doc. 21; non-document entry of Jan. 12, 2026).

On February 3, 2026, Furmage submitted an untimely Traverse along with attachments in support, and I granted his motion for untimely filing on February 19, 2026. (ECF Doc. 22 *and attachments*; non-document entry of Feb. 19, 2026). Respondent filed a reply to the Traverse on March 3, 2026. (ECF Doc. 23). The matter is now fully ripe.

## II.      Factual Background

The Ohio Court of Appeals, Eleventh Appellate District, Ashtabula County, set forth the facts of this case on direct appeal. These factual findings are presumed correct unless Furmage rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Eleventh District presented the facts as follows:

> {¶2} The charges stem from allegations that Furmage repeatedly sexually abused his stepdaughter when she was between the ages of 7 and 12. Furmage was indicted on eight counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, and eight counts of gross sexual imposition in violation of R.C. 2907.05(A)(4)/(C)(2), felonies of the third degree. The indictment sets forth the following eight time-periods during which one count each of gross sexual imposition and rape were charged: (1) February 13, 2014 through May 2014; (2) June through August 2014; (3) September 2014 through May 2015; (4) June 2015 through August 2015; (5) September 2015 through May 2016; (6) June 2016 through August 2016; (7) September 2016 through February 22, 2017; and (8) March 3, 2017 through July 30, 2019.
>
> {¶3} Prior to trial, Furmage filed a motion in limine to exclude all evidence and testimony regarding a separate importuning case in which he had been charged. The trial court ruled that only evidence related to the present case would be permitted unless Furmage decided to testify, in which case evidence of other criminal activities could be used for impeachment purposes.

2

{¶4} The matter proceeded to jury trial, after which the jury returned guilty verdicts on all counts. Thereafter, the court imposed a prison sentence as follows: 15 years to life on each of the first seven rape counts, 10 years to life on the remaining rape count, and 60 months on each of the eight counts of gross sexual imposition, with all sentences to be served consecutively.

. . .

{¶9} Here, the jury found Furmage guilty of rape, in violation of R.C. 2907.02(A)(1)(b), and gross sexual imposition, in violation of R.C. 2907.05(A)(4). R.C. 2907.02(A)(1)(b) provides, "No person shall engage in sexual conduct with another * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." The trial court sentenced Furmage based upon the jury's additional finding that the victim was less than 10 years of age at the time of seven of the charged rapes. See R.C. 2971.03(B)(1)(b). R.C. 2907.05(A)(4) provides, "No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * the other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person."

{¶10} In support of the charges, at trial, the state presented the testimony of the victim, the victim's mother, a friend of the victim's mother, the victim's grandmother, a Children Services investigative caseworker, and the detective that investigated this case.

{¶11} The victim, who was 13 years of age at the time of trial, testified that after her mother and Furmage began seeing each other, when the victim was about seven years old, they moved into a yellow house. Furmage had an office in the basement of the yellow house, where he would play the "tickle game" with the victim nearly every day. The "tickle game" consisted of Furmage putting his hand down the victim's pants and rubbing her vagina. Sometimes he would insert a finger into her vagina. Furmage had also placed the victim's hand on his penis under his clothing. The victim did not at that time know that there was anything wrong with the "tickle game," but Furmage told her not to tell anyone about the game because "bad stuff" could happen to her, her mom, and her siblings, and because Furmage would get in trouble. The victim estimated that Furmage touched her vagina on approximately 30 occasions, with digital penetration occurring 10 to 15 times, while they resided at the yellow house.

{¶12} The victim further testified that they moved from the yellow house into a two-story house in 2017, when she was 10 years old. When they moved, their new house included a first-floor room that Furmage used as an office. Although he did not touch her as much in the new house as he had in the yellow house, the victim maintained that Furmage continued to play the "tickle game" with her in his home office approximately once per week until shortly before she turned 12 years old. The victim estimated that digital penetration occurred on approximately five

occasions at the two-story house. In addition, the victim maintained that Furmage showed her pictures of his penis on his phone, and at one point he unsuccessfully attempted to insert his penis into her vagina. The victim told her mother about the abuse shortly after Furmage was arrested in a separate case.

{¶13} The victim's mother testified that when the victim disclosed the abuse, she called Detective Taylor Cleveland, who suggested that she take the victim for a forensic interview at Children Services. The caseworker who conducted the interview with the victim authenticated a recording of that interview, which was published for the jury and admitted into evidence.

{¶14} The victim's mother maintained that she continued to speak with Furmage after the victim's disclosure because he had not yet been charged in the victim's case and she did not want to tip him off that anything was awry. After charges were brought against him, the victim's mother testified that Furmage offered to pay $1000 to the victim if she recanted. The victim's grandmother also testified that Furmage had told her that he would pay the victim $1000 if she recanted. On cross-examination of the grandmother, she denied making statements to Furmage that she would back him up in court or that she believed the victim was lying.

{¶15} In addition to the purported bribe, a significant amount of the state's evidence focused on a typed letter allegedly found in Furmage's truck. The letter was entered into evidence by the state. The letter appears wrinkled, dirty, somewhat ripped and worn, and contains typed page numbers on the bottom of each page. The bottom half of one page and top half of another appear to have been ripped off, and the pages contain a crease in the center indicating that they had been folded in half. The handwritten numbers 1, 2, and 3, appear at the top of certain pages. The substance of the letter contains graphic sexual propositions, invites the recipient to respond as to whether she would be willing to engage in these sex acts, and questions how much she would charge for specific acts. The letter is not signed, and the intended recipient is not named. However, the letter contains references to the author previously vaginally massaging and performing oral sex on the recipient in the basement of the "yellow house" and playing the "tickle game." The victim testified that Furmage attempted to give her the letter while they were alone in his truck in August 2019. She told Furmage that she did not want the letter and did not know what Furmage did with the letter after that, but he told her that he threw it away.

{¶16} Misty, a friend of the victim's mother and of Furmage, testified that she and her boyfriend, Daniel, borrowed Furmage's truck in August 2019. While cleaning off the floorboard on the passenger side of the truck, Misty came across this letter. Misty then held onto the letter for approximately two weeks before giving it to the victim's mother. She delayed because of the disturbing nature of the letter. The victim's mother testified that Misty notified her about the letter the day after borrowing the truck, and the mother notified Detective Cleveland. The victim's mother gave the letter to the detective on the same day as the victim's interview with Children Services, which the caseworker testified occurred on August 20, 2019. On cross-examination, the victim's mother could not recall if she had a

telephone conversation with Furmage's brother the day prior to the letter being found. However, she acknowledged that she may have had conversations with Furmage's brother concerning the son she and Furmage share, but she could not remember the extent of the conversations because she was in a "bad place" at that time and was using methamphetamines.

{¶17} Detective Cleveland reported that the victim's mother told him that she found the letter when cleaning out the truck. On cross-examination of Detective Cleveland, he confirmed that law enforcement had confiscated Furmage's laptop and sent it to the Cyber Crimes Unit of the Bureau of Criminal Investigation ("BCI") to search for the keywords "tickle," "yellow," and "basement," which were all used in the typed letter. The detective confirmed that a report from BCI had been returned to the prosecutor's office. At that point, an off-the-record discussion between the court and counsel was held. When cross-examination resumed, defense counsel did not continue questioning regarding the BCI report from Furmage's laptop.

{¶18} The defense declined to make a Crim.R. 29 motion at the close of the state's case-in-chief. As part of the defense's case, counsel elicited testimony from friends and family of Furmage, Misty's prior boyfriend Daniel whom she referenced in her testimony above, and prior friends of the victim. The defense further recalled the victim's grandmother.

{¶19} One of Furmage's friends testified that he lived with Furmage at the yellow house in the basement for about two years. In addition, Furmage's daughter testified that she lived with Furmage in the yellow house from approximately 2014 to 2015, and her bedroom was in the basement. She maintained that the victim did not come into the basement very much. Furmage's daughter also lived with the family at the two-story house. Furmage's friends and family testified that they were frequently at the two-story house, and two of the friends testified that they lived at that house for certain periods of time. These witnesses did not see anything inappropriate between the victim and Furmage and indicated that it did not appear to them that the victim was afraid of Furmage. The witnesses further testified that several children resided at the houses, and the family's adult friends frequently visited the two-story house.

{¶20} Daniel testified that he borrowed Furmage's truck for two days around August 2019. The truck was "a wreck" inside. He did not recall anyone else using the truck with him, and he had no knowledge of the letter that was admitted into evidence.

{¶21} Furmage's brother testified that he spoke with the victim's mother regarding the son that she and Furmage share. Furmage's brother maintained that the day before he became aware of the letter, he had told the victim's mother that she needed to be a more "respectable" mother to her and Furmage's son so that she and Furmage could raise the child without intervention of Furmage's brother and parents.

5

{¶22} One of Furmage's friends, Shauna, testified that she regularly babysat for Furmage. She maintained that she was at the two-story house in August 2019 when the victim's mother was making copies of the letter. Shauna maintained that the letter that was introduced into evidence was in a different condition than the letter when she read it, and the victim's mother put page numbers on the copies. Furmage's daughter also testified that she looked at the letter, and the victim's mother read it to her at the two-story house. Furmage's daughter maintained that the letter that was admitted into evidence was different than the letter the victim's mother had shown her at the two-story house, as it previously had not been divided into three parts, did not contain page numbers at the top, and none of the pages were cut in half.

{¶23} H.S. testified that she was friends with the victim and frequently stayed overnight in the victim's home in 2018 and 2019. H.S. learned about the victim's accusations against Furmage when the victim's mother gave her the letter to read at the victim's house. H.S. maintained that the letter introduced into evidence differed from the letter that she read because there were no top or bottom page numbers on the letter she read, and some of the wording was different.

{¶24} H.S. further testified that she recorded a telephone conversation between herself and the victim on July 7, 2020. The recording was published to the jury. During this conversation, the victim indicated that she was not raped, but she had to cooperate with the prosecution or she and her mother would get into trouble. H.S. testified that Shauna's daughter, M.B., was a mutual friend of hers and the victim, and M.B. was present with H.S. during the telephone call.

{¶25} M.B. testified that she has known Furmage her entire life. M.B. testified that the victim's mother was "showing off" the letter when she was at their house in the summer of 2019. However, she maintained that the letter admitted into evidence had been altered, as it had previously been in one packet, not divided into three, was clean and folded, and did not contain page numbers.

{¶26} On cross, M.B. acknowledged that Detective Cleveland had interviewed her at her school regarding Furmage, and she had told the detective that Furmage told her that she was "hot" and had shown her a picture of his penis on his phone. However, M.B. denied that she had told the detective that Furmage offered to be her "uncle sugar daddy" and was attempting to contact her through Snapchat. Thereafter, M.B. maintained that the victim's mother had forced her to tell the detective horrible things about Furmage, threatening that she would be in trouble otherwise. However, she denied that she told the detective that she was trying to distance herself from Furmage and maintained that she was very upset during the interview.

{¶27} Furmage's son testified that when he was a boy scout, Detective Cleveland was his leader from 2017-18, and the detective had used the phrase "tickle game."

{¶28} The defense recalled the victim's grandmother, at which time it played audio of telephone conversations between the victim's grandmother and Furmage, containing statements that the grandmother denied making when the defense had earlier questioned her on cross-examination. In the first recording played, the grandmother said to Furmage: "Like I said, I'll back you up in court." The second recording provides:

[Victim's grandmother]: "[The victim] is the one that needs to be ashamed that she lied."

Justin Furmage: "Yeah, you're d*mned right. You know?"

[Victim's grandmother]: "It's all on [the victim]."

{¶29} The victim's grandmother acknowledged her voice in these recordings, but she maintained that she was drinking heavily during the time period that these conversations were recorded and did not recall making these statements. She further indicated that she no longer believed the statements that she had made to Furmage.

{¶30} After the defense rested, the state called Detective Cleveland to rebut the testimony of certain witnesses. The detective testified that he never used the term "tickle game" in boy scouts. Further, the detective authenticated an audio recording of the interview between himself and M.B., wherein M.B. states that Furmage told her "how hot" she was and then showed her a picture of his penis. After she asked him not to show her that, Furmage offered to be her "uncle sugar daddy or something like that." M.B. then states that she had to remove Furmage from Snapchat because he would not leave her alone.

*State v. Furmage*, 2022-Ohio-1465, 2022 WL 1307050, *1-5 (Ohio Ct. App. May 2, 2022)

("*Furmage I*").

### III. State Court History

#### A. State Conviction

On November 5, 2019, the Ashtabula County Grand Jury indicted Furmage on eight counts of rape (Counts 1, 3, 5, 7, 9, 11, 13, and 15) in violation of Ohio Revised Code Section 2907.02(A)(1)(b), and eight counts of gross sexual imposition (Counts 2, 4, 6, 8, 10, 12, 14, and 16) in violation of Section 2907.05(A)(4)(C)(2). (ECF Doc. 8-1, pp. 5-10). The allegations in the indictment stated the victim was a minor born in 2007 and under ten or thirteen years old,

7

depending on the date of the offense. (*Id.*). Furmage pled not guilty on November 19, 2019. (*Id.* at p. 11).

On July 6, 2020, Furmage filed a motion in limine to exclude any information, evidence, testimony, or witnesses related to a separate case, 19CR494. (*Id.* at pp. 13-15). On September 8, 2020, Furmage filed a second motion in limine to exclude the State from using any testimony from Jacqueline Almberg, stating that a physician's letter had found her incompetent. (*Id.* at pp. 16-18). The State opposed that motion. (*Id.* at pp. 19-21). The State filed its own motion in limine, arguing for the admission of evidence from the other case, including cross-examining defense witnesses regarding sexual contact and sexual conduct, because the same investigation led to charges in both cases. (*Id.* at pp. 23-25). On September 15, 2020, the state trial court overruled Furmage's motion to exclude the testimony of Jacqueline Almberg and granted the State's motion to cross-examine defense witnesses. (*Id.* at p. 26).

On September 18, 2020, a jury found Furmage guilty of all counts of the indictment. (*Id.* at pp. 27-60). On November 9, 2020, Furmage was sentenced to a mandatory 15 years to life on each of Counts One, Three, Five, Seven, Nine, Eleven, and Thirteen, and a mandatory 10 years to life on Count Fifteen, for a combined total of 115 years to life on the eight rape convictions. (*Id.* at p. 62). Furmage was also sentenced to sixty months on each of Counts Two, Four, Six, Eight, Ten, Twelve, Fourteen, and Sixteen, to be served consecutively to each other, and consecutive to the other eight counts.. (*Id.* at pp. 62-63). Furmage was also subject to a period of three years post-release control under Ohio Revised Code Section 2967.28 for the eight gross sexual imposition convictions. (*Id.* at p. 64). The trial court also informed Furmage that he was classified as a Tier III sexual offender and advised him of his registration and duties under that

classification. (*Id.*). The trial court notified Furmage of his appeal rights, found him indigent, and appointed David W. Perdue as appellate counsel. (*Id.* at p. 65).

### B.     Direct Appeal

On November 30, 2020, Furmage filed a notice of appeal in the Eleventh District Court of Appeals. (ECF Doc. 8-1, pp. 70-72). On December 8, 2020, appointed appellate counsel filed a motion to dismiss, noting that both he and retained counsel had filed an appeal on that date. (*Id.* at pp. 83-85). On December 14, 2020, the appellate court granted the motion to dismiss and directed that the separate case filed by retained counsel, Ashtabula App. No. 2020-A-0057, would proceed. (*Id.* at p. 86). On September 3, 2021, through retained counsel Katelyn Pruchnicki, Furmage filed his appellant's brief. (*Id.* at pp. 88-121). He raised nine assignments of error, as follows:

I.      Appellant's convictions for rape and gross sexual imposition are against the manifest weight of the evidence.

II.     Appellant was denied his constitutional right to a fair trial when the trial court permitted the State of Ohio to elicit improper opinion testimony from a witness during its case-in-chief in violation of Rule 701 of the Ohio Rules of Evidence.

III.    Appellant was denied his constitutional right to present a full and complete defense by the trial court's exclusion of evidence Appellant sought to introduce on rebuttal to impeach the testimony of a witness called to testify during the State's case-in-chief.

IV.     Appellant was denied his constitutional right to a fair trial and due process of law when the trial court permitted the State of Ohio to introduce cumulative evidence improperly on rebuttal.

V.      The trial court erred by failing to grant a mistrial after several members of the jury were exposed to extrinsic information by a witness who was called to testify on behalf of the State of Ohio during its case-in-chief.

VI.     Appellant was denied constitutional right to a fair trial and due process of law based upon prosecutorial misconduct committed by the State of Ohio throughout trial and during its closing argument.

VII.       Appellant was denied the effective assistance of trial counsel.

VIII.      The cumulative effect of multiple error at trial, even if singularly insufficient to warrant reversal, together deprived Appellant of a fair trial and his constitutional right to due process of law.

IX.      The trial court erred in imposing consecutive sentences absent sufficient findings pursuant to R.C. § 2929.14 and relied upon inappropriate considerations in imposing Appellant's sentence.

(*Id.* at p. 91). The State opposed on September 21, 2021. (*Id.* at pp. 122-164). On May 2, 2022, the state appellate court found each of the assignments of error lacked merit and affirmed the judgment of the trial court. (*Id.* at pp. 165-200; *see also State v. Furmage*, 2022-Ohio-1465, 2022 WL 1307050 (Ohio Ct. App. May 2, 2022)).

On June 15, 2022, Furmage, through counsel David L. Doughten, filed a notice of appeal in the Ohio Supreme Court. (ECF Doc. 8-1, pp. 202-21). His brief in support of jurisdiction raised five propositions of law:

Proposition of Law I:
If multiple jurors of a criminal trial overhear a comment by a state witness that the witness possesses proof of the defendant's guilt outside of the testimony, the failure of the trial court to hold a full hearing to determine the extent to which the improper comment may have biased the juror and/or if the comment was communicated to the remainder of the panel requires a new trial.

Proposition of Law II:
A witness may not provide opinion testimony as to the authorship of a unfairly prejudicial letter without a sufficient foundation establishing a reasonable probability of reliability of such and opinion. Ohio Rule of Evidence 701.

Proposition of Law III:
The preclusion of testimony material to a criminal defendant's defense to the charged offenses violates the right to present a defense as guaranteed by the right of compulsory process if the precluded testimony is material to the discrediting of the States theory of the case.

Proposition of Law IV:
Repeated instances of the prosecution misstating evidence, misrepresenting the law, accusing a defendant of uncharged offenses, and generally encouraging the jury to base its verdict on emotion rather than the evidence individually and cumulatively act to deprive a defendant his right to a fair trial.

10

> Proposition of Law []V:
> A defendant is denied effective assistance of trial counsel to object to meritorious issues that altered the reliability of the verdict.

(*Id.* at pp. 205-06). The State opposed on July 12, 2022. (*Id.* at pp. 223-41). The Ohio Supreme Court declined to accept jurisdiction pursuant to Ohio Supreme Court Practice Rule 7.08(B)(4) on August 30, 2022. (*Id.* at p. 242; *see also State v. Furmage*, 193 N.E.3d 581 (Ohio 2022) (Table) ("*Furmage II*")).

### C.      Post-Conviction

On July 29, 2022, while his direct appeal was pending before the Ohio Supreme Court, Furmage, through counsel David L. Doughten, filed an application for reopening under Appellate Rule 26(B). (ECF Doc. 8-1, pp. 243-44). He raised as error the following:

> I.      Furmage's direct appeal counsel was constitutionally ineffective.
>
> II.      Appellate Counsel were Prejudicially Ineffective for Failing to Raise Meritorious Issues.

(*Id.* at p. 245). Furmage also sought to raise sub-claims of ineffective assistance of trial counsel through reopening of his direct appeal. (*Id.* at p. 254). The State opposed on August 26, 2022. (*Id.* at pp. 255-64). On November 18, 2022, the Eleventh District Court of Appeals denied the application for reopening, finding it without merit. (*Id.* at pp. 265-75). On December 14, 2022,

11

Furmage appealed the denial to the Ohio Supreme Court. (*Id.* at pp. 276-92). His memorandum

in support of jurisdiction raised one proposition of law:

> A defendant is denied effective assistance of appellate counsel if such counsel fails
> to raise meritorious issues that were not in need of outside the record development
> to fully address the assignment of error.

(*Id.* at p. 279). The state did not respond. On February 28, 2023, the Ohio Supreme Court

declined to accept jurisdiction pursuant to Ohio Supreme Court Practice Rule 7.08(B)(4). (*Id.* at

p. 294; *see also State v. Furmage*, 203 N.E.3d 739 (Ohio 2023) (Table) ("*Furmage III*").

## IV.     Federal Habeas Corpus Petition

In his Petition, Furmage asserts the following grounds:

Ground One: Petitioner's convictions are against the sufficiency of the evidence[1]
in violation of the Fourteenth Amendment of U.S. Constitution.
Supporting Facts: Petitioner's convictions for rape and gross sexual imposition are
against the manifest weight of the evidence and not supported by sufficient
evidence in violation of petitioner's due process rights in the Fourteenth
Amendment of the U.S. Constitution.

Ground Two: The trial court permitted the state to elicit improper opinion testimony
in violation of the Fourteenth Amendment of U.S. Constitution.
Supporting Facts: Petitioner was denied his constitutional right to a fair trial when
the trial court permitted the state to elicit improper opinion testimony from a
witness during its case in chief in violation of due process rights in the Fourteenth
Amendment of the U.S. Constitution.

Ground Three: Petitioner was denied his right to present a complete defense and
evidence in violation of the Fourteenth Amendment of U.S. Constitution.
Supporting Facts: Petitioner was denied his right of due process to present a full
and complete defense by the trial court's exclusion of evidence he sought to
introduce on rebuttal to impeach the testimony of a witness called to testify during
the state's case in chief and thus in violation of the Fourteenth Amendment of the
U.S. Constitution.

Ground Four: The trial court permitted the state to introduce cumulative evidence
in rebuttal in violation of the Fourteenth Amendment of U.S. Constitution.

---

[1] In his Petition, Furmage listed Ground One as a manifest-weight claim. (ECF Doc. 1, p. 5). However, he later
sought, and was granted, leave to amend this ground to assert the state law manifest-weight claim as a federal
sufficiency of the evidence claim. (ECF Docs. 16, 20).

Supporting Facts: Petitioner was denied his constitutional right to a fair trial and due process of law when the trial court permitted the state to introduce cumulative evidence in rebuttal during appellants case in chief.

Ground Five: The trial court failed to grant a mistrial after the jury was exposed to extrinsic information by the state's witness in violation of the Fourteenth Amendment of the U.S. Constitution.
Supporting Facts: The trial court erred by failing to grant a mistrial after several members of the jury were exposed to extrinsic information by a witness who was called to testify on behalf of the stated during its case in chief which violated the Fourteenth Amendment of the U.S. Constitution.

Ground Six: Petitioner was denied his right to a fair trial based on prosecutorial misconduct in violation of the Fourteenth Amendment of the U.S. Constitution.
Supporting Facts: Petitioner was denied his constitutional right to a fair trial and due process of law based upon prosecutorial misconduct committed by the state throughout trial and during its closing arguement [*sic*] in violation of the U.S. Constitution.

Ground Seven: Petitioner was denied his right to the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments of the U.S. Constitution.
Supporting Facts: Petitioner was denied his right to the effective assistance of counsel at trial (i.e. and during his appeal) in violation of the Sixth and Fourteenth Amendments of the U.S. Constitution.

Ground Eight: The cumulative effect of multiple errors at Petitioner's trial violated the Fourteenth Amendment of the U.S. Constitution.
Supporting Facts: The cumulative effect of multiple errors at Petitioner's trial even if singularly insufficient to warrant reversal, together deprived petitioner of a fair trial and violated his due process rights in violation of the Fourteenth Amendment of the U.S. Constitution.

Ground Nine: The trial court erred in imposing consecutive sentences by relying on inappropriate considerations in violation of the Fourteenth Amendment of the U.S. Constitution.
Supporting Facts: The trial court erred in imposing consecutive sentences without making the statutory required procedure findings and relied upon inappropriate considerations in violation of due process rights in the Fourteenth Amendment of the U.S. Constitution.

(ECF Doc. 1, pp. 5-14).

13

### V.      Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104-132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), applies to Furmage's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). This is so because "[s]tate courts are adequate forums for the vindication of federal rights" and AEDPA thus acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). As a result, AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted).

Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Cullen*, 563 U.S. at 181, quoting 28 U.S.C. §§ 2254(a), (b), (c). Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application shall not be granted . . . unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

14

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007). The burden of proof rests with the petitioner. *Cullen*, 563 U.S. at 181.

First, clearly established federal law for purposes of AEDPA review includes "the holdings, as opposed to dicta, of [U.S. Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to U.S. Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court despite both cases having materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), *cert. denied*, 549 U.S. 1047 (2006). Even so, a state court does not act contrary to clearly established federal law where U.S. Supreme Court precedent is ambiguous or otherwise unavailable. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision is an unreasonable application of Supreme Court precedent where the state court's adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; see also *Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). Under § 2254(d)(2), a state court's factual determination will stand unless it is objectively unreasonable in light of the evidence presented in state court. *Harrington v. Richter*, 562 U.S. 86, 100 (2011). "[A] federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Next, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear

15

and convincing evidence." 28 U.S.C. § 2554(e)(1). And, as the U.S. Supreme Court has repeated, "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18. Federal courts must also defer to a state court's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982).

In all, federal habeas corpus relief is a "guard against extreme malfunctions in the state criminal justice systems," and is different in kind from the relief available in direct appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (internal quotation omitted). Thus, to obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) ("When the state court has not assessed the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").

### A.      Procedural Barriers to Federal Habeas Corpus Review

Before coming to federal court, a state habeas petitioner must overcome certain procedural barriers, including exhaustion of state remedies and procedural default. *See Daniels v. United States*, 532 U.S. 374, 381 (2001). A federal court sitting in habeas review may review claims that were evaluated on the merits by the state court. But claims that were not evaluated by a state court, either because they were never fully presented to the state court (*i.e.*, state court

16

remedies were unexhausted) or because they were not properly presented to the state court (*i.e.*, they are procedurally defaulted) are unavailable for federal habeas corpus review. *Bonnell v. Mitchel*, 301 F. Supp. 2d 698, 722 (N.D. Ohio 2004), *aff'd sub nom. Bonnell v. Mitchell*, 212 F. App'x 517 (6th Cir. 2007).

### B.       Exhaustion

A petitioner must first give the state courts a "*fair*" opportunity to act on his claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (emphasis in original). For a claim to have been fairly presented, the factual and legal basis of the claim asserted by the petitioner must have been raised at each and every stage of state review. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). It is not enough for the claim raised in state court to be "somewhat similar" to the one raised in the habeas petition or implicate the same facts; the state court must have been called on to apply the legal principles of the claim now presented to the federal courts. *Jalowiec v. Bradshaw*, 657 F.3d 293, 304 (6th Cir. 2011).

The petitioner also must have presented their "claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law." *Williams*, 460 F.3d at 807 (quotation marks omitted). In this Circuit, this can be done in one of four ways:

(1)      reliance upon federal cases employing constitutional analysis;

(2)      reliance upon state cases employing federal constitutional analysis;

(3)      phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or

(4)      alleging facts well within the mainstream of constitutional law.

*McMeans*, 228 F.3d at 681 (paragraph breaks added).

Failure to exhaust occurs where state court remedies are still "available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). This failure to exhaust

17

can also lead to a petitioner procedurally defaulting his claims. If the petitioner has not fully utilized his state remedies and has no legal mechanism to do so now, the claim he failed to present is procedurally defaulted, and this Court cannot act on the claim either. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Williams v. Anderson*, 460 F.3d 789, 809 (6th Cir. 2006).

### C. Procedural Default

The procedural default doctrine limits federal review if the petitioner has failed to follow the state's procedural requirements for presenting his or her claim in state court. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). This doctrine flows from the insight that courts must have the authority to insist that "defendants present their arguments on time and according to established procedures." *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019). Thus, a federal habeas court will not consider a habeas petition if "the last state-court judgment denying relief on the claim rests on a procedural state-law ground that is 'independent of the federal question and is adequate to support the judgement.'" *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (quotation marks omitted).

This Circuit consults a four-part test to determine whether a petitioner has procedurally defaulted a claim. A petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Because the procedural-default bar to federal habeas review is harsh, courts have created safety-valves to permit review in limited circumstances. A petitioner can obtain review of

procedurally defaulted claims if they show: (1) "cause," *i.e.*, that some external factor kept him from complying with the state rule or fairly presenting his claim; and (2) "prejudice," *i.e.*, that, assuming the petitioner's constitutional claim has merit, there is a reasonable probability that a different verdict would have resulted if the alleged constitutional violation hadn't occurred. *Coleman*, 501 U.S. at 750; *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012). A petitioner can also obtain review of a procedurally defaulted claim if the procedurally defaulted claim is based on new evidence that the petitioner was factually innocent of the crime of conviction. *See Coleman*, 501 U.S. at 750 ("fundamental miscarriage of justice" exception to procedural default); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim would establish that the petitioner was "actually innocent."). But "[A]ctual[] innocen[ce]" means "factual innocence, not mere legal insufficiency."; *Bousley v. United States*, 523 U.S. 614, 623 (1998). To overcome procedural default, an actual innocence claim must be supported by "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Moreover, because Petitioner is appearing pro se, the allegations in his Petition must be construed in his favor, and his pleadings are held to a less stringent standard than those prepared by counsel. *Urbina v. Thoms*, 270 F.3d 292, 295 (6th Cir. 2001). However, this Court may dismiss the Petition at any time or make any such disposition as law and justice require, if it determines the Petition fails to establish adequate grounds for relief. *See Lonchar v. Thomas*, 517 U.S. 314, 325 (1996); *see also* 28 U.S.C. § 2243. This can include cases where a petitioner fails to exhaust state court claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1982) (dismissal may be necessary where a § 2254 petition contains both exhausted and unexhausted state court claims); *cf. Rhines v. Weber*, 544 U.S. 269, 279 (2005).

## VI.    Discussion

Respondents argue Furmage's petition is time-barred, and circumstances do not warrant equitable tolling. (ECF Doc. 8, pp. 17-21; ECF Doc. 23, pp. 6-9). As Furmage notes in his petition, the Ohio Supreme Court issued its decision in his postconviction appeal on February 28, 2023. (ECF Doc. 1, p. 16; ECF Doc. 8-1, p. 294; *see also Furmage III*, 203 N.E.3d 739 (Ohio 2023) (Table)). He had filed his postconviction appeals while his direct appeal was still pending; the Ohio Supreme Court declined jurisdiction in direct review on August 30, 2022. (ECF Doc. 8-1, p. 242; *see also Furmage II*, 193 N.E.3d 581 (Ohio 2022) (Table)). Therefore, statutory tolling applies to the entire period between the conclusion of his direct review on August 30, 2022 and the conclusion of his state postconviction review on February 28, 2023. *See* 28 U.S.C. §§ 2244(d)(1)(A), (d)(2). Therefore, Furmage had until February 28, 2024 to file his federal habeas corpus petition. *See id.* He asserts that he placed the petition in the prison mailing system on November 29, 2024. (ECF Doc. 1, p. 18). Furmage's petition is therefore untimely by nine months, absent equitable tolling.

### A.    Furmage's petition is untimely and equitable tolling is unwarranted.

As stated, AEDPA applies to Furmage's petition for writ of habeas corpus. *Lindh*, 521 U.S. at 336. And AEDPA sets several limits on the power of a federal court to grant a Section 2254 petition for a prisoner in state custody. *See Cullen*, 563 U.S. at 181. One such limit is the one-year statute of limitations requiring a petitioner file their federal habeas petition within one year after their direct review concludes, unless that time is tolled. 28 U.S.C. §§ 2244(d)(1)(2). As that provision states, the statute of limitations runs

from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

20

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* §§ 2244(d)(1)(A)-(D). The statute of limitations is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending[.]" *Id.* § 2244(d)(2).

But AEDPA's one-year statute of limitations does not present a jurisdictional bar; an untimely petition may yet receive equitable tolling. *Borns v. Chrisman*, 167 F.4th 335, 343 (6th Cir. 2026); *see also Holland v. Fla.*, 560 U.S. 631, 649 (2010). "'[A] petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649, quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Attorney error may warrant equitable tolling, where that attorney's unprofessionalism was "egregious" and cause for the "extraordinary circumstance" standing in the way of the otherwise-diligent petitioner's timely filing. *See Holland*, 560 U.S. at 651 (collecting cases). The type of attorney misconduct meriting equitable tolling includes instances where the attorney has effectively abandoned their client, failed to perform an essential service, denied the client access to their files, or failed to file the petition at all. *See id.*

However, equitable tolling is applied "sparingly." *Borns*, 167 F.4th at 346, quoting *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010). It is available only in the extraordinary circumstance – a "garden variety claim of excusable neglect" leading to "a simple miscalculation" of the filing deadline will not equitably toll an untimely petition. *Holland*, 560

U.S. at 651-52. This is particularly so where the delayed petition is months late. *Borns*, 167 F.4th at 346 (denying equitable tolling after a 364-day delay in the state postconviction filing caused the federal habeas petition to be untimely); *see also, e.g.*, *Greene v. Lafler*, 457 F. App'x 485, 487 (6th Cir. 2012) (denying equitable tolling after a five-month delay in filing the federal habeas petition).

Furmage acknowledges in his Petition that it was untimely filed. (ECF Doc. 1, pp. 16-17). In his Traverse, he states that he had one year after exhausting his appeals at all state levels to file his federal habeas corpus – in other words, he must file "by or before February 28, 2024." (ECF Doc. 22-3, p. 4). He explains that he and his mother collectively paid $7,500 to attorney Kimberly K. Corral & Associates on August 16, 2023. (*Id.*). He asserts there that he had hired Attorney Corral to represent him and timely file a federal habeas corpus petition. (ECF Doc. 1, pp. 16-17). He asserts that although six months remained for timely filing, neither Ms. Corral nor her firm filed anything on his behalf. (*Id.* at p. 17). He stated that his family had written and called over a dozen times in the remaining months to ask if it was filed. (*Id.*). Furmage states that in January 2024, Attorney Corral had told him that the habeas corpus petition was filed and to await the outcome. (*Id.*). In support, he provides credit card statements showing the $7,500 payment (ECF Doc. 1-2); that Attorney Corral requested to be his attorney of record on August 21, 2023 (ECF Doc. 1-3); and on October 22, 2024, he noticed Attorney Corral by letter that she had breached their contract by failing to submit a timely federal habeas corpus petition (ECF Doc. 1-6). He also includes correspondences from 2023 and 2024 where he requests updates on his case. (ECF Docs. 1-7, 1-8, 1-9, 1-10, 1-11, 1-12, 1-13). He states that over the course of 15 months from August 16, 2023 through November 2024 he attempted to proactively engage with Attorney Corral, but she did not file anything in his case, so he then "diligently filed this Pro Se

22

Habeas Corpus petition case now at bar." (ECF Doc. 22-3, p. 4). He and his mother terminated Attorney Corral and requested she return the $7,500 retainer. (*e.g.*, ECF Doc. 22-5, p. 2; ECF Doc. 22-15). Should this version of events prove true, then equitable tolling might apply.

However, as Furmage later revealed in his Traverse, he had retained Attorney Corral "to continue the filing and pursuit of his criminal Appeals." (ECF Doc. 22-3, p. 4). And this is what proves fatal to his claims of equitable tolling. Furmage states that, despite the $7,500 retainer, "[n]o written contract was signed or entered into by Corral, Petitioner, or his Mother. None exists." (*Id.*). And included as an attachment to his Traverse, Furmage provides a November 20, 2024 letter from Attorney Corral on her firm's letterhead, in response to his termination letter the month before. (ECF Doc. 22-16). Attorney Corral's letter states in its first paragraph: "To be clear, we were not retained for habeas representation. All conversations had about your case, the price quoted for your case, and the representation agreement furnished in your case reference post conviction litigation." (*Id.* at p. 1). Attorney Corral goes on to explain that she does not do federal habeas claims for $7,500, and the (unexecuted) contract her firm sent to Furmage's mother[2] on August 16, 2023 stated "'My fee for representing Justin Furmage is $15,000. My representation is limited to post-conviction review in the Ashtabula Court of Common Pleas, Case No. 2019 CR 676.'" (*Id.*). She confirms that she was only retained to pursue state postconviction review and that filing a federal claim was not contemplated by the parties. (*Id.* at p. 2). She offered to provide an accounting of time and return any unused funds, (*id.*), and returned the $7,500 retainer in full on January 31, 2025 (ECF Doc. 22-18).

With this fuller accounting of events, it is clear that no attorney error occurred to cause the late filing of Furmage's federal habeas corpus petition. Attorney Corral was not retained to

---

[2] The letter also states that Attorney Corral attached a copy of this email retrieved from her case software, but this referenced attachment was not included in the exhibits to Furmage's Traverse. (*See* ECF Doc. 22-16).

file his federal petition; Furmage engaged with her firm only to pursue state postconviction remedy. (ECF Doc. 22-16). And, after learning of Furmage's discontent, Attorney Corral returned the full amount of the retainer to his mother, even though her firm had expended some time in pursuing his state claims. (*See* ECF Docs. 22-16, 22-18). With respect to his federal habeas petition, Attorney Corral made no error. She was not retained for these services and therefore had no duty to file the present petition. Any delay in filing is Furmage's alone.

I therefore find that equitable tolling does not apply to save Furmage's petition, and recommend the District Court dismiss the petition as untimely.

**B.      Actual Innocence does not apply to excuse Furmage's untimely filing.**

To excuse "filing his habeas corpus 9 months past the one year time limit," Furmage argues that his claims are based on "'Actual Innocence' and 'Miscarriage of Justice' exceptions" (ECF Doc. 22-3, p. 18). But despite invoking his actual innocence, the arguments made in support focus on an alleged miscarriage of justice relating to evidence at trial. (*See id.* at pp. 26-36). He argues that because the state failed to include the full trial transcript in the Return of Writ, particularly a 3-page letter used at trial, Respondent failed to file a complete record and intentional false representation. (*Id.* at pp. 32-36). He asserts that this letter was the "#1 piece of evidence relied on to convict Furmage" (*Id.* at p. 26), that the evidence was tainted, that witnesses committed perjury, and police officials were corrupt, all in order to falsely convict him. (*Id.* at pp. 26-35). Furmage asserts that the failure to include the evidence exhibits at trial denies him his "mandatory procedural right to adequate, fair Appellate review" and asserts that the evidence is spoliated, resulting in a "clear constitutional violation." (*Id.* at p. 36). With this petition, Furmage has received his right to review in federal habeas; that right does not require

24

petitions be reviewed on the merits. His arguments attacking the evidence at trial do not advance a claim of actual innocence, nor do they merit granting equitable tolling for an untimely petition.

First, I have already addressed Furmage's counterfactual assertions that Respondents did not file a complete record when submitting the Return of Writ. (ECF Doc. 13; *see also* ECF Docs. 4, 8, 12). As stated in my earlier Orders (ECF Docs. 4, 13), the Respondent is required to comply with Rule 5 of the Rules Governing § 2254 Cases, which requires a respondent to attach relevant portions of the transcript. *See* R. 5(c) of the Rules Governing § 2254 cases. A respondent is not required to include copies of evidence used at trial. *See id.* Nor should they be. AEDPA confers a presumption of correctness on factual determinations made in state courts, 28 U.S.C. § 2254(e)(1), and a federal court may not "reopen factual disputes that were conclusively resolved in the state courts." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Furmage has not overcome this presumption of correctness, leaving only matters of law available to resolve. Respondent has submitted sufficient evidence from the state court record to resolve the questions before this Court. *Id.*

But a petition's timeliness is not a threshold inquiry. *See McQuiggin v. Perkins*, 569 U.S. 383, 400 (2013). A petitioner can also obtain review of a late-filed petition if his claims are based on new evidence that he was factually innocent of the crime of conviction. *See id.* at 392-94 (describing that a "fundamental miscarriage of justice" may give cause to excuse late filing); *see also Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (A "fundamental miscarriage of justice" can occur only when the otherwise-defaulted claim would establish that the petitioner was "actually innocent."). Yet demonstrating actual innocence is a demanding standard. *See Bousley v. United States*, 523 U.S. 614, 623 (1998). "[A]ctual[] innocen[ce]" means "factual innocence, not mere legal insufficiency." *Id.* Moreover, an actual innocence claim must be

25

supported by "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Furmage has not demonstrated he is actually innocent of the crimes of conviction. He does not assert his factual innocence, rather, he asserts only the legal insufficiency of the evidence at trial. (ECF Doc. 22-3, pp. 18-36). He does not produce new evidence of the type to demonstrate he was actually innocent. (*See id.*). This is not enough to overcome AEDPA's statute of limitations on either statutory or equitable grounds.

I therefore recommend the District Court dismiss Furmage's petition as untimely.

## VII.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(A), this Court will grant a certificate of appealability ("COA") for an issue raised in a § 2254 habeas petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right. *Cunningham v. Shoop*, 817 F. App'x 223, 224 (6th Cir. 2020). A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (internal quotation marks omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

When a claim is denied on procedural grounds, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the

26

petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id.* at 486.

Here, it is well-established that a petitioner must file a petition within one year of the conclusion of direct review, unless statutorily tolled. 28 U.S.C. §§ 2244(d)(1)(A), (d)(2). And a petitioner is entitled to equitable tolling only if he shows he has been pursuing his rights diligently and that an extraordinary circumstance stood in his way to prevent timely filing. *Pace*, 544 U.S. at 418; *Holland*, 560 U.S. at 649-50. And untimely filing may be excused if the petitioner can show they are actually innocent, supported by new reliable evidence not presented at trial. *Schlup*, 513. U.S. at 324.

Thus, if the District Court accepts my recommendations, Furmage will not be able to show that my conclusions in this Report and Recommendation are debatable. I therefore recommend that no certificate of appealability issue.

## VIII.  Conclusion

Furmage's petition was filed after AEDPA's one-year statute of limitations had run, and good cause does not exist to excuse the delay. He has not demonstrated actual innocence. I therefore recommend the District Court dismiss Furmage's habeas corpus petition as untimely. I further recommend that no certificate of appealability issue.

Dated: March 30, 2026

REUBEN J. SHEPERD
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of

the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).